BOARD OF EDUCATION OF COMMUNITY CONSOLIDATED HIGH SCHOOL DISTRICT NO. 230, COOK COUNTY, Appellant, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Appellees.

Fourth District    Nos. 4—87—0037, 4—87—0207 cons.

Opinion filed December 31, 1987.

James P. Bartley and Karl R. Ottosen, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and William D. Frazier, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Gregory J. Malovance and David B. Love, both of Winston & Strawn, of Chicago, for respondent Classified Personnel Association.

JUSTICE KNECHT delivered the opinion of the court:

We are here asked to construe the following sequence of events:

Two parties during labor contract negotiations disagree on the interpretation of a matter within the ambit of a State administrative agency. They seek that agency's guidance in resolving the controversy. A hearing officer of that agency hands down a recommended decision. The party to which that decision is adverse requests review within the agency structure. A majority of a three-member panel, sitting as the agency's final reviewing body, renders an order effectively reversing the hearing officer's determination, with one member dissenting. Subsequent to the issuance of that order, but apparently within the time frame allotted for appeal, one of two panel members who voted in the majority acts to recuse himself due to a conflict of interest. The recusal is accepted and the order is vacated. The remaining deadlocked members of the panel then decide to go back and allow the hearing officer's findings to stand as the final order of the agency as the law of that case alone.

The Illinois Educational Labor Relations Board (IELRB or Board), finding itself faced with essentially the same factual scenario in the instant appeal, similarly decided to adopt a hearing officer's previous recommendation in full as the Board's own order. That action is contested now, as are the merits of the findings contained in the recommended decision.

Community Consolidated High School District No. 230 (district), the petitioner, serves students in a 74-square mile block within southwestern Cook County. The district is comprised of three high schools. Amos Alonzo Stagg High School (Stagg), located at the northern end of the district, also houses all of the district's administrative offices. Carl Sandburg High School, situated 5½ miles south of Stagg, encompasses the central portion of the district. Sitting at the southern tip of the district some 24 miles from Stagg is Victor J. Andrew High School. Because the central administration of the district is found at one of the three schools, each individual building operates on a fairly autonomous basis. Each school has its own principal, who acts as the administrative head of his building.

A total of some 660 people are currently employed by the district in various capacities. Five recognized bargaining units negotiate with the district on behalf of a number of these employees. Beginning in 1980, the respondent Classified Personnel Association (Association) has been the officially recognized bargaining representative for some 60 classified clerical employees within the district. The Association and the district that year secured an initial three-year labor agree-

ment, the terms of which included the three principals' individual secretaries within the bargaining unit. In the spring of 1983, the Association affiliated with the Illinois Education Association (IEA/NEA), which also represents the high school teachers of the district.

During labor negotiations for a successor contract to cover the years 1983 through 1986, the status of the principals' secretaries was a major point of contention. The district sought to remove the secretaries from the bargaining unit. The Association objected. When negotiations reached an impasse, the parties agreed to seek a decision from the newly created IELRB. The question posed was whether the principals' secretaries were "confidential employees" as that term is defined in the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 1701 *et seq.*). If so, they would be inappropriate for inclusion within the bargaining unit. In the interim, and in the interest of reaching some form of collective-bargaining agreement, it was stipulated the principals' secretaries would be excluded from the bargaining unit until the IELRB could reach its determination. A labor contract between the parties reflecting that accord was ratified on December 19, 1983.

On January 30, 1985, the Association filed a unit clarification petition with the IELRB proposing to include all three secretaries to the individual building principals within the current bargaining unit. Testimony concerning the respective roles of the district principals and their secretaries was heard at a hearing conducted April 25, 1985.

On July 2, 1985, a hearing officer issued a recommended decision granting the unit clarification petition and ordering the secretaries included in union representation. Exceptions to the recommended decision and order were timely filed by the district on July 12, 1985. Upon reviewing the evidence and testimony, the Board on August 20, 1986, by a 2 to 1 margin, dismissed the petition in an opinion and order which essentially reversed the hearing officer's holding. Voting with the majority were IELRB Chairman Gerald E. Berendt and board member Wesley A. Wildman. Member Edna Krueger wrote a dissent.

Only an October 8, 1986, order of the IELRB appearing in the record indicates what occurred next. The order reflects that on September 27, 1986, member Wildman moved to recuse himself because "he had been a participant in the bargaining table agreement which had led to the stipulation of this case to the Board." Nothing beyond the October 8 order affords any explanation of the circumstances surrounding member Wildman's recusal, or why this fact was never raised until after the full Board had already rendered its decision. Our

review of the record similarly fails to indicate any prior objection to Wildman's participation on the Board. The order only states Wildman moved to recuse himself after his previous work on behalf of the district during 1983 contract negotiations was "brought to his attention," a fact "which he had forgotten."

The Board by that same order then accepted Wildman's recusal. Saddled with a tie vote among its two remaining members, the Board concluded its prior decision must be vacated, and left open for briefing the ultimate effect of this action under the circumstances.

After considering the parties' respective arguments, the Board in an order dated December 17, 1986, decided it could neither affirm nor reverse the hearing officer's recommended decision when two remaining members were equally split as to a disposition. Rather, the Board would allow the hearing officer's decision to stand as the law of the case, although without precedential effect. The decision was deemed the final order of the IELRB for purposes of administrative review only. By further order dated March 10, 1987, the Board reaffirmed its position, stating it "would adopt the Hearing Officer's Recommended Decision as the final order of the agency on the merits of this matter."

The district now seeks administrative review of both orders of the Board. Parenthetically, we note this matter is before us on direct appeal from the IELRB under authority of statute (Ill. Rev. Stat. 1985, ch. 48, par. 1716(a)), and we have consolidated the district's two separate appeals.

Several purported errors in the Board's treatment of this case are raised for our consideration by the district, errors which may be broken down into procedural and substantive concerns. We are first presented with the question of whether, under the facts, the Board's procedural undertakings yielded a proper and final administrative decision amenable to judicial review. Should the answer to this query be in the affirmative, we may then examine the second, substantive issue. There the district assails as contrary to the manifest weight of the evidence the hearing officer's ultimate finding that all three high school principals' secretaries are not "confidential employees" within the meaning of section 2(n) of the Act. Ill. Rev. Stat. 1985, ch. 48, par. 1702(n).

I

Initially we surmise a step-by-step analysis of the proceedings before the Board is in order. Only then may we discuss whether the legal effect of these factual underpinnings comports with the result settled upon by the Board.

The fact of board member Wildman's participation as a member

of the district's team in the negotiations at issue is unchallenged, even though his participation is not expressly shown beyond the IELRB's October 8, 1986, order. Taking this as a given, we agree Wildman should have been disqualified from rendering a decision in this particular matter.

■■ Our supreme court has firmly established the rule that no person may play a decision-making role in either a judicial or administrative proceeding in which that person arguably has a personal interest. (*In re Heirich* (1956), 10 Ill. 2d 357, 384, 140 N.E.2d 825, 838, *cert. denied sub nom. Erickson v. Bristow* (1957), 355 U.S. 805, 2 L. Ed. 2d 49, 78 S. Ct. 222.) "Interest" as referred to in this sense need not be pecuniary; it need only be that "which can be viewed as having a particularly debilitating effect on the impartiality of the decision-maker." *International Harvester Co. v. Bowling* (1979), 72 Ill. App. 3d 910, 914, 391 N.E.2d 168, 171.

■■ The major point in controversy during negotiations for the 1983 contract—indeed, the only point on which no accord could be reached without outside assistance from an administrative agency—is precisely the issue the IELRB was asked to resolve. Wildman's vote with the majority sided with the position he presumably took on behalf of the district during collective-bargaining talks: namely, that the principals' secretaries are confidential employees not susceptible to inclusion in the bargaining unit. Even though there is no evidence Wildman, as decision maker on the Board, acted in anything less than an exemplary manner, the existence of any personal interest in the outcome is sufficient in and of itself to invalidate a Board's decision. (*Board of Education of Niles Township High School District No. 219, Cook County v. Regional Board of Trustees of Cook County* (1984), 127 Ill. App. 3d 210, 215, 468 N.E.2d 1247, 1250.) Where one member of an administrative body is not completely disinterested, his participation adversely affects the action of the whole. *City of Naperville v. Wehrle* (1930), 340 Ill. 579, 173 N.E. 165.

■■ Again accepting as true the facts in the uncontroverted order, the remaining members of the IELRB properly accepted Wildman's recusal based upon a conflict of interest. The mere existence of any potentially disqualifying interest on Wildman's behalf tainted with invalidity the Board's September 20, 1986, opinion and order. We conclude the Board was correct when it vacated its previous decision, particularly since recusal left the Board unavoidably deadlocked.

■■ Our conclusion is not swayed by the district's argument that the Board was without the requisite authority, either by expression of statute or inherently, to vacate its prior ruling on the merits. The dis-

trict asserts because the only means of contesting a final IELRB order is via judicial review in the appellate court (Ill. Rev. Stat. 1985, ch. 48, par. 1716(a)), and not by rehearing or otherwise modifying its own decision, the Board usurped its statutory grant of power. To the contrary, once the invalidity of the Board's decision was timely discovered and acted upon because of the disqualifying interest of one member, its action was appropriate. By acting accordingly, the Board saved a reviewing court from undertaking the same step.

Likewise, we see no timeliness problem in vacating the Board's opinion. The Act provides for judicial review of any final IELRB order in accordance with the Administrative Review Law (Ill. Rev. Stat. 1985, ch. 48, par. 1716(a)), which further mandates any such appeal must be initiated within 35 days of an adverse decision (Ill. Rev. Stat. 1985, ch. 110, par. 3—103). The only express reference to the recusal procedure contained in the record (the October 8, 1986, order) relates Wildman informed the Board of his conflict on September 17, 1986, and his motion was accepted. The October 8 order, however, was entered beyond the 35-day time limit.

The district postulates that upon the running of the 35-day statutory time limit without a request for review by the Association, the Board's August 20 order became final, and the IELRB lost jurisdiction of the cause. As the Board's October 8 order was also entered more than 35 days after its original decision, the district asserts the Board was without authority to vacate.

■ Assuming *arguendo* these premises may be taken as correct statements of the law, and once again taking the uncontested facts expressed in the October 8 order as true, we believe instead Wildman's recusal on September 17 was timely accomplished as within 35 days of the Board's August 20 opinion. The Board was possessed of the authority within 35 days to accept the recusal and then vacate its decision.

■ The district's attempt in its brief to invoke the common law "rule of necessity" is similarly unavailing. The "rule" authorizes a decision to be made by an official who has the legal duty to make it, despite also having some personal interest or stake in the outcome. (*International Harvester Co. v. Bowling* (1979), 72 Ill. App. 3d 910, 914, 391 N.E.2d 168, 171; see also *People ex rel. Illinois Federation of Teachers v. Lindberg* (1975), 60 Ill. 2d 266, 326 N.E.2d 749, *cert. denied* (1975), 423 U.S. 839, 46 L. Ed. 2d 58, 96 S. Ct. 67.) However, where there is anyone else who can act in place of the interested administrative or judicial officer, the rule of necessity will not be applicable. (*Smith v. Department of Registration & Education* (1952), 412

Ill. 332, 342, 106 N.E.2d 722, 727.) Thus in *Mank v. Board of Fire & Police Commissioners* (1972), 7 Ill. App. 3d 478, 288 N.E.2d 49, the court deemed the rule inapplicable where one member of a three-person board could have excused himself from hearing a dispute, and the agency could still proceed with its two remaining members constituting a statutory quorum. There is also commentary to the effect the rule does not operate where the disqualification of one member of a board would leave an even number of members sitting, and these board members might also divide evenly so that no decision could be reached by the only body authorized to act. (73 C.J.S. *Public Administrative Law & Procedure* §61(b), at 532-33 (1983).) Based upon the clear weight of authority, the rule of necessity similarly does not arise here.

Our conclusion regarding the nonapplicability of the rule is further buttressed by a provision in the Act itself. Section 5(a) allows for two members of the Board to constitute a quorum, which may then exercise all powers of the Board. (Ill. Rev. Stat. 1985, ch. 48, par. 1705(a).) After Wildman's recusal, a majority or quorum of the Board remained. The two members were thus possessed of the authority to act even in the absence of one disqualified member.

Having deemed the IELRB procedure up to this point appropriate, we may now turn to whether the Board's ultimate treatment of these circumstances yielded a proper result. Considering the effect of a deadlocked vote upon one member's recusal, the IELRB settled on the following course in its December 17, 1986, order:

> "Although hearing officers have the authority to issue final orders if no party files exceptions to their decisions, when exceptions are filed, the Board must review those decisions. However, where a tie vote exists, the Board may decide neither to affirm nor reverse a hearing officer's decision, but to let it stand as the law of the case. That decision, along with the Hearing Officer's Recommended Decision and Order, becomes the final order of the Board for purposes of administrative review. Since the Hearing Officer's decision is neither affirmed nor reversed, it is without precedential effect; it stands, as written, as the final order of the agency subject to appellate review."

On March 10, 1987, the Board reaffirmed its December 17 decision to neither affirm nor reverse, but instead to "adopt" the recommended decision of the hearing officer as the law of the case.

Contested educational labor matters such as this come before the IELRB for a determination because unresolved disputes between edu-

cational employers and their employees are "injurious to the public." (Ill. Rev. Stat. 1985, ch. 48, par. 1701.) Passage of the Illinois Educational Labor Relations Act represents legislative deference to recognized public policy interests in promoting orderly and constructive educational employer-employee relationships. To that end, the Act grants educational employees the right to freely organize, requires employers to collectively bargain with such recognized representatives, and establishes procedures to protect the rights not only of those parties, but of the public generally. (Ill. Rev. Stat. 1985, ch. 48, par. 1701 *et seq.*) The authority to additionally promulgate rules and regulations necessary to implement the Act's avowed purposes rests by statute with the Board. Ill. Rev. Stat. 1985, ch. 48, pars. 1705(h), 1709.

As provided for in IELRB regulations, either an exclusive-bargaining representative or an educational employer may file a petition to clarify an existing bargaining unit. (80 Ill. Adm. Code 1110.160(a) (1985).) Questions of the excludability of confidential employees as they are defined in the Act are among the disputes to be resolved by the IELRB. (80 Ill. Adm. Code 1105.20(a) (1986).) When a hearing on a unit clarification petition is deemed essential, a hearing officer shall inquire fully into all matters in dispute, obtaining a full and complete record and ultimately filing a recommended disposition with reasons. (80 Ill. Adm. Code 1110.160(c)(3) (1985).) Once a recommended decision and order is issued, a party seeking full review of that decision must file timely exceptions. (80 Ill. Adm. Code 1110.160(c)(3) (1985).) The Board then:

> "[W]*ill review* the hearing officer's recommendation upon request of a party or on its own motion. The Board *shall adopt all, part, or none of the recommendation* to the extent that the recommendation is consistent with the Act." (Emphasis added.) 80 Ill. Adm. Code 1110.160(c)(5) (1984).

See also 80 Ill. Adm. Code 1105.80(c) (1986) (the Board "shall review the Hearing Officer's decision and any exceptions \*\*\* and [it] *will* issue \*\*\* a written decision giving the Board's reasons for its determination"). (Emphasis added.)

The IELRB on appeal argues it was merely following the course allowed for under the Act and the regulations as promulgated. The two remaining Board members were still empowered to act as a quorum, but they could not agree on an ultimate disposition. Not wishing to leave the parties without a resolution of their dispute, the IELRB asserts the two remaining members merely acted to "adopt" the hearing officer's recommendation in full as the disposition for *this*

*matter only.* Such action, the IELRB believes, affords a decision on the merits which may be appealed, yet does not allow the hearing officer's recommendation to serve as binding precedent in other controversies argued before the Board.

By way of analogy, the IELRB suggests its handling of the matter is consistent with the prevailing practice in Illinois where the justices of our supreme court are equally divided. In *Perlman v. First National Bank* (1975), 60 Ill. 2d 529, 331 N.E.2d 65, a decision of the supreme court could not be reached because two justices recused themselves, and the remaining members of the court were so divided it was impossible to secure the concurrence of four justices as required by the Illinois Constitution. (See Ill. Const. 1970, art. VI, §3.) The court determined it could then only affirm the judgment of the court below. Such an affirmance, the court in *Perlman* continued, would serve as a conclusive determination of the controversy between the parties before it, but would not be entitled to any precedential weight. The ultimate effect was the same "as if the appeal was dismissed." *Perlman*, 60 Ill. 2d at 530, 331 N.E.2d at 66; see also *Getschow v. Commonwealth Edison Co.* (1984), 99 Ill. 2d 528, 459 N.E.2d 1332 *(per curiam).*

Analogy to situations faced by deadlocked reviewing courts is not entirely apposite, though, and therefore of little persuasion. While our conclusion in this regard could rest upon several grounds, we note one significant distinguishing feature: the type of review undertaken by the supreme court differs greatly from that pursued within an administrative agency. For example, with limited exceptions, there exists no absolute right to appeal to our supreme court. (See Ill. Const. 1970, art. VI, §4; see also 107 Ill. 2d Rules 315, 316.) Parties requesting review before our State's highest tribunal ordinarily must seek leave to have their petition heard and granted. (107 Ill. 2d R. 315.) Where the court as a matter of its own judicial discretion decides not to hear the matter, leave to appeal is denied, and the appeal is dismissed. Such a dismissal does not act as an adjudication of the controversy by the supreme court. Rather, under normal circumstances the appellate court disposition stands as both the law of that case and as precedent for all courts in that district. Thus when an appeal is accepted by the supreme court, but in those infrequent instances where a disposition cannot subsequently be rendered because a constitutional majority or quorum of four cannot agree, the result is the same: the appeal is dismissed, and the cause cannot be cited as the authority of the supreme court on the issues raised.

Contrasted with this is the IELRB rule which states the Board

"will review" a hearing officer's recommended decision upon the timely filing of exceptions. (80 Ill. Adm. Code 1110.160(c)(4) (1985).) We interpret this to mean there exists a right to appeal a hearing officer's decision to the full Board if the prerequisites to review within the agency are met, a right analogous perhaps to the right to appeal a final circuit court decision to our appellate courts. For reasons to be fleshed out in greater detail below, allowing a hearing officer's determination to stand as the law of the case without also granting a party his rightful appeal before at least a quorum of the Board is tantamount to depriving that party of his full review before the agency.

The briefs also make mention of a route employed by the National Labor Relations Board (NLRB). In each NLRB decision called to our attention, a three-member panel of the Board on review unanimously voted to affirm the entirety of an administrative law judge's rulings, findings, and conclusions, thereby adopting those rulings as the NLRB's own final order on the matter. The reasoning of the administrative judge was then reported in full without change as the NLRB decision. (See, *e.g.*, *Tomco Carbureter Co.* (1985), 275 N.L.R.B. 1; *Shimazaki Corp.* (1985), 274 N.L.R.B. 15; *December 12, Inc.* (1984), 273 N.L.R.B. 1.) These cases, however, did not turn upon the divided vote of a board after the abstention or vacancy of one member. These cases are not only dispositive of the effect of an equal deadlock, they are entirely inapposite on this issue as they are 3-0 decisions of a three-member NLRB panel designated to hear the case. Since 1947, section 3 of the Labor Management Relations Act (LMRA) has provided the NLRB Board consists of five, rather than three, members. The Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise, with three members of the Board constituting a quorum of the five-member Board, and two members constituting a quorum of any group of members designated to exercise delegated powers. 29 U.S.C. §153 (1982).

The district extends an alternative employed by the Pennsylvania Labor Relations Board (PLRB). In certain decisions of that body directed to our attention, only two members of the PLRB were able to participate, and they were divided upon the resolution of all issues. Because a tie between two sitting members could not be broken, the PLRB ordered the complaints or petitions rescinded. (*In re Employees of Bristol Township School District*, 13 Pub. Employee Rep. (Pa.) par. 13292, case No. PERA—R—80—35—E (Pennsylvania Labor Relations Board, Oct. 20, 1982); *Pennsylvania Labor Relations Board v. Juniata Valley Tri-County Mental Health & Mental Retardation Pro-*

*gram,* 13 Pub. Employee Rep. (Pa.) par. 13293, case No. PERA—C—81—529—E (Pennsylvania Labor Relations Board, Oct. 20, 1982).) Merely dismissing a petition filed before the administrative body entrusted with resolving disputes arising within its purview, without any disposition whatsoever on the controversy, is a particularly unsavory result. As it is the least viable of the alternatives suggested, we will not follow it.

Resolution of this procedural issue turns instead on a literal reading of both the applicable IELRB regulations and the relevant Illinois Administrative Code provisions. The IELRB's own administrative rules provide the Board upon its review of a matter "shall *adopt all, part or none*" of the hearing officer's recommended decision to the extent that decision is not inconsistent with the Act. (Emphasis added.) (80 Ill. Adm. Code 1110.160(c)(5) (1985).) Thus, when timely exceptions to a recommended decision are filed, the Board has only certain options available to it when it considers the full record in the matter. It may "affirm" by adopting all (or perhaps even part) of the recommendation based also upon the Board's interpretation of the Act. Otherwise the Board may adopt none (or part) of the recommended decision, effectively reversing that determination, again to bring the outcome in line with both the Board's expertise in the area and with the provisions of the Act itself.

Under this scheme the ultimate authority to administratively interpret statutes or regulations belongs where it should: with the full administrative board, not a hearing officer. An agency has principal responsibility for interpreting statutory provisions consistent with either its own or a legislature's intent and objectives. Granted, it may appoint an officer to hear factual testimony and evidence and to render an otherwise binding decision. Where review is sought, though, the administrative body has the authority to override a statutory or factual evaluation made by one of its own hearing officers.

In setting forth the powers of the three-member Illinois Educational Labor Relations Board, the Act states:

"Two members of the Board constitute a quorum and a vacancy on the board *does not impair the right of the 2 remaining members to exercise all of the powers of the Board.*" (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 48, par. 1705(d).)

Moreover, "[w]ords purporting to give a joint authority to three or more public officers or other persons shall be construed as giving such authority to a majority of such officers or persons." Ill. Rev. Stat. 1985, ch. 1, par. 1010.

The recusal of member Wildman clearly did not impair the right

of the two remaining members to exercise all powers of the Board. They constituted a statutory quorum or majority. They were empowered to act by accepting the recusal and vacating the August 20, 1986, opinion based in part upon a disqualifying interest of a decision maker and in part upon the resultant 1 to 1 deadlock.

The December 17, 1986, order of the Board set forth the reasons why the two remaining Board members felt the recommended disposition must be affirmed as the law of the case without precedential effect, to serve as the Board's order only for purposes of further review in the courts. The March 10, 1987, order then purported to adopt the decision as the final order of the agency for the reasons set forth in the earlier order.

■ We consider this second order to be the operative action of the Board. This order represents the unanimous decision of Chairman Berendt and member Krueger to adopt the hearing officer's recommended disposition. Agreeing to disagree, they issued an order which allowed for final resolution of the matter in controversy. Their decision to adopt is therefore approved.

We certainly would have preferred a procedure below whereby the deadlock could have been broken, particularly since the practical result here is reinstatement of a previously reversed recommended disposition. For instance, appointment under authority of regulation of a special board member for the sole purpose of hearing this dispute might be a legitimate avenue. Nevertheless, the conclusion we reach is inescapable given the actions undertaken and the law as it stands.

We remark there is great potential for continued difficulty in a legislative scheme which sets up a three-member board without regard for the possibility of conflict, disability, or absenteeism of any one member. What at first glance might be characterized as an unusual set of circumstances is perhaps not such a singular aberration. The IELRB was only recently created, and the Code fairly recently adopted, both with effective dates of January 1, 1984. (Pub. Act 83–1014 §29 (eff. Jan. 1, 1984).) Each of the the three appointive members of the Board must have a minimum of five years' experience in educational, labor, and employment relations matters in order to serve on that body. (Ill. Rev. Stat. 1985, ch. 48, par. 1705(a).) Given this prerequisite of related experience in the field, along with the relative newness of the IELRB, it is not entirely unlikely the Board may come across a similar situation where one of its members previously served either of the parties to a dispute.

In sum, we affirm the Board's action in vacating its opinion and adopting the recommended decision of the hearing officer.

## II

We now address the merits of the substantive issue presented. Broadly stated, we are to ascertain whether the decision of the hearing officer, now standing as the final IELRB order akin to any other final determination of that agency, is contrary to the manifest weight of the evidence. In this vein we stress it is only the decision of the hearing officer which is subject to administrative review before this court. The opinions expressed in both the majority and dissent of the since-vacated August 20, 1986, Board order are no longer of any moment.

■■ ■ We restate, as a framework for our analysis, certain basic guidelines for administrative review. Section 3—110 of the Administrative Review Law provides agency findings and conclusions on questions of fact are *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) Courts may not interfere with the discretionary authority vested in administrative bodies unless an administrative decision is against the manifest weight of the evidence. (*Eastman Kodak Co. v. Fair Employment Practices Comm'n* (1981), 86 Ill. 2d 60, 76, 426 N.E.2d 877, 884.) Courts may also intervene only if an agency exercises its authority in an arbitrary or capricious manner. (*Dorfman v. Gerber* (1963), 29 Ill. 2d 191, 193 N.E.2d 770.) A reviewing court may in no instance, however, reweigh the evidence presented or make an independent determination of the facts; a court's primary function, assuming there has been no abuse of administrative authority, is to ascertain whether these factual findings are contrary to the manifest weight of the evidence. (*Murdy v. Edgar* (1984), 103 Ill. 2d 384, 391, 469 N.E.2d 1085, 1088.) That will occur when an opposite conclusion is clearly apparent from the record. *Madonia v. Houston* (1984), 125 Ill. App. 3d 713, 466 N.E.2d 648.

■■ On points of law, courts are to accord substantial weight and deference to the interpretation placed on a statute by the agency charged with its administration and enforcement. (*Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 536, 508 N.E.2d 1058, 1062.) Still, reviewing courts are not in all instances completely bound by an agency's interpretation of law. *Worthen v. Secretary of State* (1987), 160 Ill. App. 3d 325, 513 N.E.2d 475.

■■ The district complains the findings of the hearing officer are contrary to the manifest weight of the evidence. The district disputes the officer's conclusion that secretaries to the three high school principals here are not "confidential employees" as defined in section 2(n) of the Act (Ill. Rev. Stat. 1985, ch. 48, par. 1702(n)), and therefore may not be excluded from an educational employee bargaining unit.

Objection is also made to the officer's finding that inclusion of the principals' secretaries within the bargaining unit would be appropriate under the standards enumerated in the Act.

As we have earlier noted, the avowed purpose of the Act is to regulate labor relations between educational employers and employees for their benefit as well as that of the general public. (Ill. Rev. Stat. 1985, ch. 48, par. 1701.) Section 2 defines "educational employee" as "any individual, *excluding* supervisors, managerial, *confidential*, short term employees, student, and part-time academic *employees* *** employed full or part time by an educational employer." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 48, par. 1702(b).) A "confidential employee" is denoted as one who either:

"(i) [I]n the regular course of his or her duties, assists and acts in a confidential capacity to persons who formulate, determine and effectuate management policies with regard to labor relations or who (ii) in the regular course of his or her duties has access to information relating to the effectuation or review of the employer's collective bargaining policies." Ill. Rev. Stat. 1985, ch. 48, par. 1702(n).

Thus, while the Act establishes procedures "to provide for the protection of the rights of the educational employee" (Ill. Rev. Stat. 1985, ch. 48, par. 1701(c)), those falling within the ambit of "confidential employee" by definition are excludable from labor organizations which otherwise represent those employees and act to protect their rights.

By its terms section 2(n) sets up two separate yet related definitions of "confidential employee." Subsection (i), commonly referred to as the "labor nexus" test, tracks language utilized in National Labor Relations Board (NLRB) decisions. Although the NLRB operates under no statutory counterpart, beginning with its decision in *In re Ford Motor Co.* (1946), 66 N.L.R.B. 1317, 1322, the NLRB has regularly defined "confidential employees" as those who "assist and act in a confidential relation to persons who formulate, determine and effectuate management policies in the field of labor relations." (See also *Dun & Bradstreet, Inc.* (1979), 240 N.L.R.B. 162, 163; *B. F. Goodrich Co.* (1956), 115 N.L.R.B. 722, 724.) Consistent with further NLRB interpretations, and as set forth under section 2(n)(i) of the Illinois Act, the confidentiality aspect of the "labor nexus" test is qualified by the phrase that any such information must relate specifically to the field of labor relations. Ill. Rev. Stat. 1985, ch. 48, par. 1702(n)(i); see *Vermilion Occupational Technical Center*, 1 Pub. Employee Rep. (Ill.) par. 1103, case No. 84—UC—0003—S (Illinois Educational Labor Rela-

tions Board, April 17, 1985).

Subsection (i) additionally encompasses two threshold determinations. First, emphasis is placed on the allegedly managerial or supervisory employee, such as the high school principals here. These employees must initially be found to "formulate, determine *and* effectuate" labor relations policy. (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 48, par. 1702(n)(i).) All three standards are equally pertinent. (See *Greyhound Lines, Inc.* (1981), 257 N.L.R.B. 477, 480 ("formulate, determine and effectuate" requirement is always read in the conjunctive, not the disjunctive), *enforced* (4th Cir. 1982), 676 F.2d 692.) Second, should that preliminary inquiry be met, the focus shifts to the particular employee whose inclusion in the bargaining unit is disputed. To be considered confidential, that employee must also, in the regular course of his or her duties, "assist and act in a confidential capacity" to the aforementioned recognized supervisory or managerial employee. Ill. Rev. Stat. 1985, ch. 48, par. 1702(n)(i).

Subsection (ii) delineates a second measuring stick for conferring confidential status. Known as the "access" test, it provides so long as the employee in question has regular access to "information relating to the effectuation or review of the employer's collective bargaining policies" (Ill. Rev. Stat. 1985, ch. 48, par. 1702(n)(ii)), then that employee may be excluded from a collective-bargaining unit.

This court has once previously considered whether certain secretaries to high school, junior high school, and elementary school principals could be accorded confidential status within the meaning of section 2(n)(i). In *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 493 N.E.2d 1130, this court held under subsection (n)(i) the principals in that school district did not, either individually or collectively, "formulate, determine, and effectuate" labor relations policy. Accordingly, their secretaries could not be considered confidential employees under the labor-nexus test. We note because the school district in that case only argued the applicability of subsection (n)(i), the *Plainfield* decision does not expressly stand for any points according to the "access" test under section 2(n)(ii).

Both the Association and the IELRB on appeal believe *Plainfield* is completely controlling here. However, as this court cautioned in *Plainfield*, it is "unlikely" that any two school districts will be organized in the same fashion, and a manifest weight case such as that decision will seldom serve as precedent for another. (143 Ill. App. 3d at 905, 493 N.E.2d at 1135.) *Plainfield* is not factually dispositive of

the instant matter merely because individual secretaries to principals there were deemed nonconfidential under those facts. Since each bargaining unit determination is dependent upon factual variations, each case should be decided on an *ad hoc* basis. The legal principles expounded in *Plainfield*, though, would apply with equal clarity to our analysis under section 2(n)(i).

We consider now the decision of the hearing officer at issue. Several individuals, including two secretaries, a high school principal, and an assistant superintendent for personnel of the district, testified during the April 25, 1986, hearing. Our review of the record and recommended decision convinces us the hearing officer made certain correct conclusions of facts from the evidence and testimony adduced. Without overstating those facts, we endeavor to summarize the pertinent findings for purposes of reaching our disposition.

The record reveals the district principals are heavily involved in personnel management within their respective buildings. As such, they conduct individual interviews of prospective hirees; make hiring recommendations for certified and classified employees; undertake routine evaluations of those employees; make tenure recommendations for teachers; and are called upon to discipline classified and certified employees, both formally and informally, at the first-step level. Any official action regarding recommendations, evaluations, or other actions, when reduced to writing, is usually typed by the principals' secretaries and placed by them in employee personnel files. Copies are also forwarded to the district's central personnel office.

With regard to grievance proceedings instituted by aggrieved classified and certified employees, the principals' role is normally limited to the first step, again on either a formal or informal basis. For those classified personnel the principal does not directly supervise, though, the principal sits at the second grievance level.

Testimony indicated the district seeks the principals' recommendations and input in contract negotiations. Principals are requested to review agreements or proposals submitted by employee organizations. The principals also attend official, biweekly Board meetings as well as unofficial weekly meetings. In preparation for the official meetings, "board packets" containing all documents the Board expects to utilize at the meeting are distributed to the principals' offices. These packets may contain matters to be reviewed in closed session, including labor proposals.

A "new management plan" recently implemented by the district after discussions with the principals instituted certain changes which resulted in shorter work weeks for some classified employees, affect-

ing their salary levels also. The principals also aided in planning the district's "School Day Committee," which formulated a school day schedule within collective-bargaining and budgetary constraints. As the committee's final recommendation restructured the school day, negotiations with the teachers' union on that point were necessitated.

The secretaries themselves perform general clerical duties. Their functions include: handling all correspondence going in and out of the principal's office; opening the mail, including parcels marked "confidential," although they are not to open letters marked "personal"; screening telephone calls; scheduling appointments; typing memoranda and other documents; maintaining files and office supplies; and keeping track of certain budget accounts the principal is responsible for overseeing. These secretaries would also help organize the "board packets" which came into the principals' offices prior to official meetings. They also maintained operational and personnel files, to which they had complete access. Each person employed in the building had a corresponding personnel file. Any such file would contain an employee's original application, transcripts, notations as to previous experience, recommendations to hire, evaluations subsequently conducted, and also disciplinary records, if any. Letters of reprimand or recommendations typed by the secretaries are placed in the respective personnel files.

Several persons testified they believed the position of principal's secretary was not "interchangeable" with that of any other clerical help. Karen Marie Moriarty, assistant superintendent for personnel, stated she believed superintendents, Board members, and other administrators would ask the principals' secretaries to perform certain tasks they would not require of other secretaries. Administrators would make district business telephone calls in front of those secretaries which they would not make around the other secretarial help. Moriarty also felt the principal's secretary serves as a "conduit" for all information from the central district offices to and from the principal. She stated each principal's secretary processes, formulates, distributes, files, and provides security for all information relating to personnel matters in the building.

In the decision and order dated July 7, 1985, the Board, through its hearing officer, initially reasoned the "confidential employee" exclusion under the Act is aimed at avoiding educational employees who are represented by collective-bargaining units from having advance knowledge of their employer's position with regard to ongoing contract negotiations. Such untimely exposure to the employer's bargaining posture would jeopardize negotiation strategy concerning wages

and hours and conditions of employment.

From the evidence, the officer began by concluding district principals satisfied the first portion of section 2(n)(i), as they are persons who "formulate, determine and effectuate" management policy with regard to labor relations. However, the officer concluded from the record the secretaries do not in the regular course of their duties assist or act in a confidential capacity to the principals. Having failed to meet the second requirement under subsection (i), it was held the secretaries were not excludable from the bargaining unit on that basis.

Next, the hearing officer found while the secretaries do have full and regular access to district employee personnel files, they do not possess regular access to labor materials of such importance to the collective-bargaining process that, if divulged, would compromise the employer's position. Thus, the secretaries did not meet the "access" test under section 2(n)(ii). Finally, in full consideration of the record, the hearing officer concluded the principals' secretaries were otherwise appropriate for inclusion in a bargaining unit with other classified personnel. See Ill. Rev. Stat. 1985, ch. 48, par. 1707(a).

We acknowledge the section 2(n) exclusion goes to maintaining the *status quo* in educational labor negotiations by removing from a unit otherwise-covered employees who have the potential for obtaining advance knowledge of confidential labor relations information, thereby upsetting the normal balance of negotiations. In *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 907, 493 N.E.2d 1130, 1186, this court viewed the Educational Labor Relations Act as a form of remedial legislation, determining it should be "construed liberally to effectuate its purpose." Because those individuals ultimately deemed "confidential employees" under the labor-nexus test will be prevented from exercising the full panoply of rights otherwise guaranteed to them by the Act, this court found the statutory exclusion under section 2(n) must be narrowly interpreted consistent with Federal developments. As such, it was noted the NLRB "has always excluded from the bargaining unit employees who had advance notice of the employer's position with respect to labor relations matters." 143 Ill. App. 3d at 907-08, 493 N.E.2d at 1136.

In *NLRB v. Hendricks County Rural Electric Membership Corp.* (1981), 454 U.S. 170, 70 L. Ed. 2d 323, 102 S. Ct. 216, the United States Supreme Court found a reasonable basis in law for excluding from collective-bargaining units an employee with a so-called "labor nexus." It was the Court's view that the NLRB's long-standing, nar-

row interpretation of the exclusion was appropriate because it did not unduly limit the rights of rank-and-file employees to collectively organize and bargain. The Court thus approved the NLRB's practice of restrictively limiting the term "confidential" in the labor-nexus approach "so as to embrace only those employees who assist and act in a confidential capacity to persons who formulate, determine and effectuate management policies in the field of labor relations." (454 U.S. at 189, 70 L. Ed. 2d at 337, 102 S. Ct. at 228, quoting *B. F. Goodrich Co.* (1956), 115 N.L.R.B. 722, 724.) Accordingly, the Court acceded to the view that management should not be required to handle labor relations matters through employees in a union who, in the normal performance of their duties, "may obtain advance information of the [c]ompany's position with regard to contract negotiations, the disposition of grievances, and other labor relations matters." 454 U.S. at 179, 70 L. Ed. 2d at 331, 102 S. Ct. at 223, quoting *Hoover Co.* (1944), 55 N.L.R.B. 1321, 1323.

We conclude the hearing officer's determination that the principals' secretaries do not regularly assist or act in a confidential capacity in regard to *labor relations matters* was not against the manifest weight of the evidence. Labor relations encompasses ongoing or future collective-bargaining negotiations and strategy, not general, though undoubtedly otherwise confidential, district administration matters. Again, we are in accord with the hearing officer's conclusion that the labor-nexus test is designed to protect against premature disclosure of bargaining positions. The secretaries undoubtedly act in a confidential capacity regarding general district business in each principal's office, including general procedural matters such as employee discipline or tenure recommendations. However, we see little evidence or testimony which goes to the thrust of the limited exception: that is, to avoiding advance knowledge of another side's bargaining strategies which would compromise the entire process. To allow for the possibility that confidential information of the employer significant to labor relations matters would be in the hands of the members of a bargaining unit is completely detrimental to the entire process. The IELRB itself has held the overall tenor of section 2(n) is protection of employers "from premature disclosure of their bargaining proposals and labor relations policies that could undermine their bargaining strategies." *Community Consolidated School District No. 59*, 2 Pub. Employee Rep. (Ill.) par. 1088, case No. 85—UC—0009—C (Illinois Educational Labor Relations Board, June 24, 1986).

■ There is some indication the secretaries do act in a confidential capacity to the principals with regard to grievances. We regard

such evidence as insufficient, though, to overturn the hearing officer's overall determination. First, the principals are normally involved only in the first step of the grievance procedure, except in regard to classified employees who are not directly under the principals' supervision. When conducted informally, the grievance disposition is not reduced to writing. Second, merely typing the result does not show the secretaries had any advance notice. Finally, as the NLRB has determined, it does not normally follow that an employee with mere access to records of grievances always acts in a confidential capacity. (*California Inspection Rating Bureau* (1974), 215 N.L.R.B. 780.) Nor does the typing of disciplinary letters or other materials relating to personnel problems (*ITT Grinnell Corp.* (1974), 212 N.L.R.B. 734), or being a secretary to a person involved in the handling of grievances (*Holly Sugar Corp.* (1971), 193 N.L.R.B. 1024), always render that employee confidential.

▆▆ Moving next to contentions arising under the "access" test of subsection (n)(ii), we note that test has enjoyed a more tenuous history under the Federal model. The United States Supreme Court, commenting on the validity and scope of the access test, has noted:

> "[W]hile continuing to apply the labor-nexus test, the [NLRB] has deviated from that stated intention in only one major respect: it has also, on occasion, *consistent with the underlying purpose of the labor-nexus test* [citation], designated as confidential employees persons who, although not assisting persons exercising managerial functions in the labor-relations area, 'regularly have access to confidential information concerning *anticipated changes which may result from collective-bargaining negotiations.*' Pullman Standard Division of Pullman, Inc., 214 N.L.R.B. 762, 763 (1974); ***." (Emphasis added.) *NLRB v. Hendricks County Rural Electric Membership Corp.* (1981), 454 U.S. 170, 189, 70 L. Ed. 2d 323, 337, 102 S. Ct. 216, 228.

Adhering to Federal guidelines, we believe access to information concerning general confidential district business matters is irrelevant. Rather, consistent with the labor-nexus test, inquiry is limited to whether the employee in question has unfettered access ahead of time to information pertinent to the review or effectuation of pending collective-bargaining policies.

In this regard the NLRB has deemed significant the precise nature of the allegedly confidential information an employee has access to. No person has been excluded as "confidential" by the NLRB based upon mere access to personnel or statistical information. (*Pull-*

*man Standard Division* (1974), 214 N.L.R.B. 762, 763.) Likewise, mere access to confidential material is insufficient to confer confidential status. (*Los Angeles New Hospital* (1979), 244 N.L.R.B. 960, *enforced* (9th Cir. 1981), 640 F.2d 1017.) On a similar note, another agency of this State has interpreted analogous statutory language to confer confidential status only where an individual employee "has authorized access to information concerning matters arising from the collective bargaining process, such as information concerning the employer's strategy in dealing with an organizational campaign, actual collective bargaining proposals and information relating to matters dealing with contract administration." *City of Burbank*, 1 Pub. Employee Rep. (Ill.) par. 2008, case No. S—RC—45 (Illinois State Labor Relations Board, June 6, 1985).

From the record it is apparent the principals' secretaries do have regular access to confidential information which comes in and out of the principals' offices. Most of this information, though, deals with general confidential school business matters, including personnel assessment. There is no dispute the secretaries have unlimited access to employee personnel files, which would include recommendations for hiring, performance evaluations, and details of any discipline or grievance matters already completed. Mindful that "access" should also concern confidential labor relations matters consistent with the narrow view expressed by the Federal authorities and alluded to by this court in *Plainfield* in relation to section 2(n)(i), we cannot say a conclusion contrary to that made by the hearing officer is clearly apparent from the record. There simply is nothing sufficient to show the secretaries' duties included having regular access to specific information of a labor relations nature, including employer strategy. We therefore affirm the hearing officer's conclusion under subsection (n)(ii).

Having determined under the applicable standard of review the hearing officer did not err when she concluded the principals' secretaries are not confidential employees under section 2(n), the secretaries may still be excluded from a bargaining unit if their inclusion would be otherwise inappropriate under the Act. The district argues this is the case.

Pursuant to section 7(a), the IELRB is charged with determining the appropriateness of a collective-bargaining unit in each individual case. (Ill. Rev. Stat. 1985, ch. 48, par. 1707(a).) That section delineates certain factors which may be considered by the IELRB. As such, a critical consideration for the IELRB is ensuring each proposed bargaining unit contains employees who share "an identifiable com-

munity of interest." (Ill. Rev. Stat. 1985, ch. 48, par. 1707.) Great deference is normally accorded to an agency's establishment of an appropriate bargaining unit since such questions are particularly well-suited to an agency's expertise. *Packard Motor Car Co. v. NLRB* (1947), 330 U.S. 485, 491, 91 L. Ed. 1040, 1050, 67 S. Ct. 789, 793.

The hearing officer found a community of interest between the principals' secretaries and all other secretaries because they performed basically the same clerical duties: all are required to type, file, take correspondence, transcribe, dictate, produce documents, and maintain files. The district's claims of lack of interchangeability of the secretarial positions notwithstanding, it is difficult to see how the hearing officer's findings under section 7(a) are contrary to the manifest weight of the evidence. Nothing in the record or under the factors enumerated in the Act would indicate these secretaries are not appropriate for inclusion in a bargaining unit containing other secretaries and clerical workers.

Accordingly, we hold: (1) the action of the Board in adopting the hearing officer's recommended decision in full is affirmed; and (2) the findings of the hearing officer are not contrary to the manifest weight of the evidence.

Affirmed.

GREEN, P.J., and LUND, J., concur.