733 N.E.2d 759 (2000)
315 Ill. App.3d 278
248 Ill.Dec. 84
GRADUATE EMPLOYEES ORGANIZATION, IFT/AFT, AFL-CIO, Petitioner-Appellant,
v.
ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD, Gerald E. Berendt, Mary Ann Louderback, Michael J. Gavin; Board of Trustees/University of Illinois at Urbana-Champaign; Governor Jim Edgar, Judith Ann Calder, William D. Engelbrecht, Jeffrey Gindorf, Susan L. Gravenhorst, Thomas R. Lamont, Ada N. Lopez, Martha R. O'Malley, Roger L. Plummer and Judith R. Reese, Respondents-Appellees.
No. 1-98-1685.
Appellate Court of Illinois, First District, Fifth Division.
June 30, 2000.
*760 Gilbert A. Cornfield, of Cornfield and Feldman, Chicago, for Appellant Graduate Employees Organization.
James E. Ryan, Attorney General; Joel D. Bertocchi, Solicitor General; John P. Schmidt, Assistant Attorney General, Chicago, for Appellee Illinois Educational Labor Relations Board.
Steven A. Veazie, Margaret M. Rawles, Office of University Counsel, Urbana; R. Theodore Clark, Jr., Thomas J. Piskorski of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, for Appellee Board of Trustees of the University of Illinois.
Kim L. Kirn, University Legal Counsel, Southern Illinois University, Edwardsville, for Amicus Curiae of Board of Trustees of Southern Illinois University, in support of Illinois Educational Labor Relations Board.
Kenneth L. Davidson, University Counsel, Northern Illinois University, DeKalb, for Amicus Curiae of Board of Trustees of Northern Illinois University, in support of *761 Illinois Educational Labor Relations Board.
Presiding Justice THEIS delivered the opinion of the court:
Petitioner Graduate Employees Organization, IFT/AFT, AFL-CIO, petitions for direct review from an opinion and order of respondent Illinois Educational Labor Relations Board (IELRB), which dismissed petitioner's petition requesting certification and recognition as the collective bargaining representative for all teaching assistants, graduate assistants and research assistants at the University of Illinois at Urbana-Champaign. On direct review, petitioner contends that the opinion and order of the IELRB were in error.[1] At issue is whether teaching assistants, graduate assistants and research assistants, who are seeking to organize, are "educational employees" who are authorized to organize or "students" who are precluded from organizing. For the reasons that follow, we reverse and remand for further proceedings.

BACKGROUND
The Illinois Educational Labor Relations Act (Act) (115 ILCS 5/1 et seq. (West 1998)) was enacted by our General Assembly in 1983. Pub. Act 83-1014, eff. January 1, 1984. The Act, together with the Illinois Public Labor Relations Act (5 ILCS 315/1 et seq. (West 1998)), represents "the first comprehensive statutory regulation of public sector collective bargaining in Illinois history." M. Malin, Implementing the Illinois Educational Labor Relations Act, 61 Chi.-Kent L.Rev. 101, 101 (1985). Indeed, prior to the Act's passage, Illinois collective bargaining law was "chaotic." 61 Chi.-Kent L.Rev. at 123. To be sure, public education employees had a constitutional right to unionize. McLaughlin v. Tilendis, 398 F.2d 287, 288 (7th Cir.1968); see Thomas v. Collins, 323 U.S. 516, 534, 65 S.Ct. 315, 324, 89 L.Ed. 430, 442 (1945). Employers, however, were under no legal obligation to recognize any such union. 61 Chi.-Kent L.Rev. at 121. Moreover, even if a union was recognized, an employer was still free to rescind such recognition at its discretion. 61 Chi.-Kent L.Rev. at 121. Employers were also free to discriminate between unions and determine which issues would be the subject of collective bargaining and which would not. 61 Chi.-Kent L.Rev. at 121-22. Despite this rather unfavorable state of the law, unions grew quickly in Illinois. 61 Chi.-Kent L.Rev. at 123. So, too, however, did the number of strikes. In fact, strikes became routine. 61 Chi.-Kent L.Rev. at 123.
As a result, the Illinois Educational Labor Relations Act was enacted to alleviate such disputes and "to promote orderly and constructive relationships between all educational employees and their employers." 115 ILCS 5/1 (West 1998). Indeed, the Act sprang from our General Assembly's conclusion that "[u]nresolved disputes between the educational employees and their employers are injurious to the public * * * and * * * that adequate means must be established for minimizing them and providing for their resolution." 115 ILCS 5/1 (West 1998). In order to best accomplish the purpose of the Act, "educational employers" were required "to negotiate and bargain with employee organizations representing educational employees and to enter into written agreements evidencing the result of such bargaining." 115 ILCS 5/1 (West 1998). "[Procedures to provide for the protection of the rights of the educational employee, the educational employers and the public" were also enacted. 115 ILCS 5/1 (West 1998). Our General Assembly further codified the right of employees to "organize, form, join, or assist in employee organizations or engage in lawful concerted activities for the purpose of collective bargaining." 115 ILCS 5/3 (West 1998).
*762 However, our General Assembly did not intend for all employees to enjoy such rights. Only "educational employees," as that term is defined within section 2(b) of the Act, were entitled to organize. Certain employees, although employed by "educational employers," were expressly denied the right to organize. Those employees were defined within section 2(b) of the Act to include "supervisors, managerial, confidential, short term employees, student[s], and part-time academic employees of community colleges employed full or part time by an educational employer." 115 ILCS 5/2(b) (West 1998).
On April 15, 1996, petitioner filed a petition with the IELRB requesting certification and recognition as the collective bargaining representative for all teaching assistants, graduate assistants and research assistants at the University of Illinois at Urbana-Champaign pursuant to section 7(c) of the Act. 115 ILCS 5/7(c) (West 1998). Following a series of evidentiary hearings, an administrative law judge concluded that teaching assistants, graduate assistants and research assistants were "student[s]" as that term was used within section 2(b) of the Act and, therefore, precluded from organizing in such a manner.
Petitioner filed exceptions to the recommended decision and order of the administrative law judge. After reviewing the recommended decision and order of the administrative law judge, as well as the exceptions filed by petitioner, the IELRB made the following findings of fact.
The University of Illinois enrolls approximately 9,000 graduate students at its Urbana-Champaign campus. Of those 9,000 graduate students, about 6,000, or two-thirds, hold one or more teaching, graduate or research assistantships. As compensation, assistants receive a monthly stipend and their tuition and fees are waived. With some exceptions, to be eligible for an assistantship, an individual must be admitted and enrolled as a student. Generally, graduate students obtain assistantships by applying and being accepted into particular programs at the University. An admissions committee then attempts to match the interests and qualifications of graduate students with available positions. However, the procedure is not uniform and for some positions students are required to interview or submit a resume.
There is no uniformity between assistantship positions. Some assistantships are for a period of one semester, while others may be for a period of up to one year. Some assistants are required to work 10 hours per week, while others are required to work more. Moreover, there is no uniformity in the level of responsibility, independence, supervision, and training associated with an assistantship.
Generally, teaching assistants either teach classes to undergraduate students or assist faculty with discussion groups, laboratory exercises and student assignments. Although some teaching assistants work in areas related to their field of study, others do not.
The duties of graduate assistants range from answering telephones to arranging research symposia. At times, their work is related to their studies; at other times, it is not.
Research assistants conduct experiments, analyze data and present findings in publications or dissertations. Additionally, research assistants assist faculty in conducting studies. Usually the work of a research assistant is related to his or her field of study, although that is not always the case.
After considering the parties' arguments, the IELRB rejected the interpretation of the term "student[s]" employed by the administrative law judge, which equated enrollment with student status. The IELRB disagreed, finding the administrative law judge's analysis too simplistic. A majority of the IELRB employed what may be termed the "significant connection" test, concluding that, if an assistantship held by a graduate student is significantly *763 connected to his or her status as a student, then he or she is a "student" within the meaning of section 2(b) of the Act and, thus, precluded from organizing. Applying this test, the IELRB reasoned that, because all assistantships are a form of financial aid and because financial aid is given only to students, there is a significant connection between employment as a teaching assistant, graduate assistant or research assistant and the student status of the graduate students holding those assistantships. Accordingly, the IELRB held that all teaching assistants, graduate assistants and research assistants at the University of Illinois at Urbana-Champaign were "student[s]" as that term is used within section 2(b) of the Act and, therefore, precluded from organizing.
A dissent was filed, contending the significant connection test was too broad and that teaching assistants, graduate assistants and research assistants should be considered "student[s]" within the meaning of section 2(b) of the Act only if the primary purpose of such assistantships, as established through objective evidence, was the furtherance of their educations.
On direct review, petitioner contends that the term "student[s]" within section 2(b) of the Act should be interpreted to include only those teaching assistants, graduate assistants and research assistants whose assistantships are required as part of their graduate educations. Respondents, however, maintain that the term "student[s]" was properly interpreted to include all teaching assistants, graduate assistants and research assistants.

DISCUSSION
First, we address the appropriate standard of review. An administrative agency's findings on questions of fact are deemed to be prima facie true and correct and will not be reversed unless they are against the manifest weight of the evidence. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill.2d 191, 204, 229 Ill.Dec. 522, 692 N.E.2d 295, 302 (1998). However, an administrative agency's determination on purely legal questions, such as statutory construction, is reviewed de novo and is not binding on a reviewing court. Belvidere, 181 Ill.2d at 204, 229 Ill.Dec. 522, 692 N.E.2d at 302; Bloom Township High School, District 206 v. Illinois Educational Labor Relations Board, 312 Ill.App.3d 943, 245 Ill.Dec. 530, 728 N.E.2d 612 (2000). Where the agency's findings are a mixed question of law and fact, "the appropriate standard is whether the decision was clearly erroneous, falling between the standard that applies to pure questions of law and that applying to pure questions of fact, `so as to provide some deference to the [agency's] experience and expertise.'" Bloom Township, 312 Ill.App.3d at 952, 245 Ill.Dec. at 539, 728 N.E.2d at 621, quoting Belvidere, 181 Ill.2d at 205, 229 Ill.Dec. 522, 692 N.E.2d at 302.
In the instant case, the IELRB's determination is best characterized as involving a mixed question of fact and law. The IELRB's finding is in part factual, because it involved assessing the characteristics of various assistantship positions and determining whether the assistantships were significantly connected to the assistants' status as students such that they should be characterized as "student[s]" under section 2(b) of the Act, as opposed to "educational employees." However, the IELRB's finding also concerns a question of law, because "student" is a legal term that requires interpretation. See Belvidere, 181 Ill.2d at 205, 229 Ill. Dec. 522, 692 N.E.2d at 302. As this case involves an analysis of the legal effect of a given set of facts, it involves a mixed question of fact and law, which is reviewed under the clearly erroneous standard.
The fundamental principle of statutory construction is to ascertain and give effect to the intention of our General Assembly, the most reliable indication of which is the very language employed. In re S.G., 175 Ill.2d 471, 480, 222 Ill.Dec. 386, *764 677 N.E.2d 920, 924 (1997). When, however, certain terms in a statute are not defined, such terms are to be given their commonly accepted meaning (Bowes v. City of Chicago, 3 Ill.2d 175, 200-01, 120 N.E.2d 15, 29 (1954)), unless to do so would conflict with the purpose of the statute (People v. Hicks, 101 Ill.2d 366, 371, 78 Ill.Dec. 354, 462 N.E.2d 473, 475 (1984)).
Pursuant to section 2(b) of the Act, "student[s]" are excluded from the definition of "educational employees" and are, therefore, precluded from organizing. 115 ILCS 5/2(b) (West 1998). In determining whether assistants should be characterized as students, the administrative law judge reasoned that the term "students" is commonly understood to mean those persons who are enrolled for study at a school, college or university. Webster's Third New International Dictionary 2268 (1993). Thus, based on the plain meaning of the term "students," the administrative law judge concluded that the assistants were properly characterized as "students" and, therefore, were not entitled to organize.
The IELRB rejected the plain meaning approach, concluding that its application conflicted with the purpose of the statute and would lead to absurd results. The IELRB reasoned that when an individual must be enrolled as a student to hold a position but the position has no relationship to the individual's status as a student, the connection between the position and the status as a student is a mere formality. Apart from this formality, the individual is indistinguishable from other employees and, in his or her role as an employee, is not, in any meaningful sense, a student.
Furthermore, the IELRB found that the adoption of a broad definition of "student" would lead to absurd results. For example, it is not uncommon for an educational employer to offer reduced tuition for employees who wish to continue their educations. Under the interpretation employed by the administrative law judge, an employee who enrolled in a class pursuant to such an offer would be deemed a "student" as that term is used within section 2(b) of the Act and, therefore, precluded from organizing. Such a result clearly defeats the manifest purpose of the Act. For these reasons, we agree with the IELRB that the interpretation of the term "student" as one who is enrolled at a school is too broad. See 61 Chi.-Kent L.Rev. at 110-11.
In contrast to the administrative law judge, the majority of the IELRB interpreted the term "student[s]" within section 2(b) of the Act to mean those graduate students whose assistantships were significantly connected to their status as students. Accordingly, the IELRB reasoned that "the term `student' must be interpreted in relation to [an] individual's employment * * * and not to his [or] her role in any other context." Thus, mere designation of an individual as a student does not transform that individual into a student for purposes of section 2(b) of the Act. To be characterized as a student for purposes of section 2(b), an individual's work must be more than incidental to his or her academic duties.
The dissent contended the significant connection test was still too broad to serve the purposes of the statute and argued in favor of the primary purpose test. Under that test, only teaching assistants who are teaching to meet a degree requirement and research assistants whose work is related to their dissertation are students and, therefore, excluded from collective bargaining.
We believe the primary purpose test is too narrow and that the significant connection test, as articulated by the majority of the IELRB, avoids the distinct problems associated with an overly broad definition of the term "student." See Board of Education of Community Consolidated High School District No. 230 v. Illinois Educational Labor Relations Board, 165 Ill. App.3d 41, 60, 116 Ill.Dec. 91, 518 N.E.2d 713, 725 (1987). When properly applied, the significant connection test reconciles *765 the statutory policy of creating harmonious labor relations in education with the potential risk that collective bargaining could undermine student-teacher relationships. Bargaining over issues such as job security, discipline or evaluations for positions that are peripheral to academic duties would not interfere with the educational relationship. Accordingly, the test adopted by the majority is not unreasonable or erroneous.
However, the IELRB failed to properly apply the significant connection test. To say, as the IELRB did, that an assistantship is significantly connected to the student status of an individual because it is a form of financial aid is merely a reformulation of the overly simplistic interpretation advanced by the administrative law judge and rejected by the IELRB. There is simply no difference between the administrative law judge defining students as all those who are enrolled in a school, college or university and the IELRB defining students as those receiving financial aid.
In support of its decision that receipt of payments constituting financial aid should be equated with student status, the IELRB relied on Leland Stanford Junior University, 214 N.L.R.B. 621 (1974) (decision and order). However, when that case is contrasted with the case at bar, the flaws in the IELRB's decision become clearly apparent. In Leland Stanford, the National Labor Relations Board found that all of the research assistants seeking to organize were required to engage in research as part of their course of instruction. Thus, financial aid provided graduate students a stipend for doing what was required of them to earn their degrees and, therefore, they were primarily students.
In contrast to the Stanford assistants, those assistants at the University of Illinois who are seeking to organize constitute a diverse group without universally shared characteristics. While all assistants share a desire to pursue an education and the corresponding need for financial support, the degree to which their work is related to their academic duties varies greatly. For example, research assistants usually perform work related to their dissertations or theses. However, graduate students who receive a stipend to answer phones are indistinguishable from other office workers. Therefore, we hold that the IELRB's conclusion that the receipt of financial aid is the determinative indicia of a significant connection between assistants' employment and their role as students is clearly erroneous.
Accordingly, this matter is remanded to the IELRB with directions to apply the significant connection test to the facts presented at the evidentiary hearings in a fair and thorough manner. Proper application of the test will exclude from organizing those graduate students whose work is so related to their academic roles that collective bargaining would be detrimental to the educational process. However, those individuals whose assistantships are not significantly connected to their status as students must be allowed the same statutory right to organize as other educational employees.

CONCLUSION
For the aforementioned reasons, we reverse the opinion and order of respondent Board and remand this matter for further proceedings not inconsistent with this opinion.
Reversed and remanded.
GREIMAN and QUINN, JJ., concurring.
NOTES
[1] The Boards of Trustees of Northern Illinois University and Southern Illinois University have been granted leave to appear, as amici curiae, on behalf of respondents. 155 Ill.2d R. 345.